IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| McGOWAN & COMPANY, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-1716 |
| | § | |
| ROGER F. BOGAN, *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This breach of contract and business torts case is before the Court on cross-motions for summary judgment. Plaintiff/Counter-Defendant McGowan & Company, Inc. ("McGowan" or "Plaintiff") filed a Motion for Partial Summary Judgment ("Plaintiff's Motion") [Doc. # 111], to which Defendants/Counter-Claimants Roger F. Bogan ("Bogan"), Swain & Baldwin Insurance ("SBI"), Universal Managers, Inc. ("UMI"), and Ray B. Baldwin ("Baldwin") (collectively, "Defendants") filed a Response ("Defendants' Response") [Doc. # 118], and Plaintiff filed a Reply ("Plaintiff's Reply") [Doc. # 121]. Defendants filed a Motion for Summary Judgment ("Defendants' Motion") [Doc. # 96], to which Plaintiff filed a Response ("Plaintiff's Response") [Doc. # 119], and Defendants filed a Reply ("Defendants' Reply") [Doc. # 123]. Both motions are ripe for review.

Having carefully reviewed the parties' briefing, all matters of record, and the applicable legal authorities, the Court **grants in part** and **denies in part** both motions for summary judgment. The Court concludes that Ohio law applies to Plaintiff's breach of contract claim because there are no grounds for setting aside the parties' contractual choice of law. Texas law, however, governs Plaintiff's tort claims, pursuant to Ohio choice-of-law rules and § 145 of the Restatement (Second) of

Conflict of Laws.

Applying Ohio law to Plaintiff's contract claim against Bogan, the Court concludes that the Trade Secrets & Special Terms Agreement (the "Agreement") is not unconscionable and is generally enforceable as explained herein.  Because Ohio law applies to Plaintiff's breach of contract claim, Plaintiff's claim for attorneys' fees pursuant to § 38.001 of the Texas Civil Practices and Remedies Code is dismissed.  Under recent Ohio law, Plaintiff may recover fair, just, and reasonable attorneys' fees pursuant to Paragraph 27 of the Agreement, if Plaintiff prevails on its breach of contract claim against Bogan.  The Court, however, declines to grant summary judgment for either party on Plaintiff's breach of contract claim on this record.  There are numerous genuine disputes of material fact on the issue of breach.  The Court requires Plaintiff to file a more definite statement clarifying its theory of damages and the evidentiary basis for recovering damages.

Applying Texas law to Plaintiff's tort claims, the Court concludes Plaintiff's claims for misappropriation of trade secrets and unjust enrichment should be dismissed.  The Court construes Plaintiff's claim for breach of the duty of loyalty under Ohio law as a claim for breach of fiduciary duty under Texas law.  Neither Bogan nor Plaintiff is entitled to summary judgment on this claim because there are genuine disputes of material fact on the element of breach, and, on the record presented, the Court declines to award summary judgment to either party on the issue of damages.  Summary judgment is also denied without prejudice on Plaintiff's claims against all Defendants for tortious interference with business relationships and tortious interference with prospective business relationships.   The parties have not meaningfully briefed the elements of Plaintiff's tortious interference claims under Texas law.  Plaintiff is required to submit a more definite statement, and the parties

may then file motions for summary judgment on these two torts in accordance with the Court's amended Scheduling Order.

Finally, Plaintiff is awarded summary judgment on Defendants' counterclaim.

## I.    BACKGROUND

### A.    Facts

Plaintiff McGowan is an Ohio corporation with its principal place of business in Ohio.  McGowan, Excess & Casualty ("McGowan Excess") is a registered trade name of McGowan.[1]  McGowan "designs, administers, and markets highly-specialized programs of insurance" and has offices in several states, including Texas.[2]  Defendant SBI is an insurance retail agent located in Texas.[3]  Defendant Baldwin is the president and sole owner of SBI.[4]  Defendant UMI is a small wholesale insurance broker, incorporated in Texas and owned by Defendant Baldwin's son, Sam Baldwin.[5]

---

[1]    While McGowan Excess appears to be a division of McGowan, the parties use the company names McGowan and McGowan Excess interchangeably.  The Court, thus, refers to both entities as "McGowan."   Additionally, parts of the record refer to "Statehouse Casualty Managers," "Statehouse Casualty," "Statehouse Managers," or "Statehouse."  It appears that Statehouse Casualty Managers became McGowan Excess in January 2011.  *See* Declaration of Robert Bogan ("Bogan Decl.") [Doc. # 97-1], ¶ 8.  Accordingly, the Court construes references to Statehouse Casualty Managers, or similar iterations of this company's name, as references to McGowan.

[2]    Plaintiff's First Amended Complaint ("Amended Complaint") [Doc. # 52-1], ¶ 9.

[3]    *See* Exhibit D to Defendants' Motion (Oral Deposition of Sam Baldwin) [Doc. # 104], at ECF page 4; Exhibit E to Defendants' Motion (Oral Deposition of Ray Baldwin) [Doc. # 106], at ECF pages 9-11; Declaration of Ray Baldwin ("Baldwin Decl.") [Doc. # 98], ¶ 9.

[4]    Baldwin Decl., ¶ 3.

[5]    *See* Exhibit D to Defendants' Motion (Oral Deposition of Sam Baldwin) [Doc. # 104], at ECF page 4; Exhibit C to Defendants' Motion (Oral Deposition of Robert F. (continued...)

The undisputed facts are as follows.  In February 2006, Bogan began working for McGowan as the Regional Vice-President and Branch Manager of the office in Dallas, Texas.[6]  Bogan worked in this capacity for McGowan for over five years.[7]  On March 13, 2006, shortly after Bogan started working for McGowan, Chris Longo, the current CEO of McGowan Excess, emailed Bogan a copy of McGowan's "Trade Secrets & Special Terms Agreement" (the "Agreement") [Doc. # 111-2].[8]  That same day, Bogan received and signed the Agreement in Texas.[9]  A McGowan representative signed the Agreement on March 30, 2006.[10]  On July 15, 2011, Bogan informed Longo he was resigning from McGowan.[11]  Bogan continued to work for McGowan for several weeks, and his last day of employment was August 5, 2011.[12]  In July or

---

[5]      (...continued)
Bogan) [Doc. # 102], at ECF page 14.

[6]      Bogan Decl., ¶ 4; Declaration of Chris Longo ("Longo Decl. dated June 4, 2012") [Doc. # 111-2], at ECF page 4, ¶ 1 & n.1.

[7]      *See* Bogan Decl., ¶ 7; Longo Decl. dated June 4, 2012, ¶ 10.

[8]      *See* Exhibit E to Response (Email from Chris Longo dated Mar. 12, 2006) [Doc. # 119-2], at ECF page 34; Longo Decl. dated June 4, 2012, ¶ 1.  There are multiple, identical copies of the Agreement in the record filed by both parties.  For convenience, the Court cites only to one copy.

[9]      Bogan Decl., ¶ 5; Agreement, at 1, 11.

[10]      Agreement, at 11.

[11]      Longo Decl. dated June 4, 2012, ¶ 15; Exhibit C to Defendants' Motion (Oral Deposition of Robert F. Bogan) [Doc. # 102], at ECF page 19.

[12]      Longo Decl. dated June 4, 2012, ¶ 16; Exhibit C to Defendants' Motion (Oral Deposition of Robert F. Bogan) [Doc. # 102], at ECF page 18.

August 2011, Bogan began working for UMI.[13]

The disputed facts center around Bogan's search for new employment and his conduct directly before and after his resignation. The parties contest the circumstances under which Bogan resigned and the facts surrounding the beginning of his employment with UMI. Plaintiff alleges that Bogan engaged in a series of activities that breached the Agreement and his fiduciary duties, such as sending emails to McGowan's customers soliciting business and redirecting potential business from McGowan to UMI or SBI.

### B.  Procedural History

On or about October 28, 2011, Plaintiff sued Defendants in the Court of Common Pleas of Cuyahoga County, Ohio. *See* Complaint [Doc. # 1-1]; Notice of Removal [Doc. # 1], ¶ 1. Defendants timely removed this case to federal district court in the Northern District of Ohio on the basis of complete diversity of citizenship between the parties. *See* Notice of Removal, ¶ 13. On June 6, 2012, the Honorable James Gwin of the Northern District of Ohio transferred this case under 28 U.S.C. § 1404(a) to the Southern District of Texas. *See* Opinion & Order dated June 6, 2012 ("Transfer Order") [Doc. # 37]. On November 2, 2012, the Court granted Plaintiff's unopposed motion for leave to file an amended complaint. *See* Order on McGowan & Company, Inc.'s Unopposed Motion for Leave to File First Amended Complaint [Doc. # 54].

Plaintiff's Amended Complaint asserts causes of action against all four Defendants (Bogan, Baldwin, SBI, and UMI) for misappropriation of trade secrets, tortious interference with business relationships, and tortious interference with

---

[13]  *Compare* Bogan Decl., ¶ 15 (stating Bogan began working for UMI in August 2011), *with* Plaintiff's Motion, at 11 (stating Bogan's I-9 form showed his employment began July 1, 2011).

prospective business relationships.  Amended Complaint, ¶¶ 30-38, 53-73.  Plaintiff further sues Bogan for breach of the Agreement, unjust enrichment, and breach of the duty of loyalty.  *Id.*, ¶¶ 39-52, 74-79.  Finally, Plaintiff requests attorneys' fees pursuant to § 38.001 of the Texas Civil Practices and Remedies Code.  *Id.*, ¶¶ 80-81.  Defendants subsequently filed a counterclaim "pursuant to Rule 11 of the Federal Rules of Civil Procedure" for "the recovery of their reasonable and necessary attorney's fees which they have been caused to incur as a result of the groundless and bad faith litigation which has been prosecuted against them by Plaintiff."  Defendants' First Amended Answer and Counterclaim ("Amended Answer") [Doc. # 53], ¶ 12.

On December 11, 2014, the parties filed the instant cross-motions for summary judgment.  These motions are ripe for review.  Defendants seek summary judgment on their counterclaim and all of Plaintiff's claims.  Plaintiff seeks summary judgment on all claims against Bogan and Defendants' counterclaim.  The Court first addresses each of Plaintiff's claims, then turns to Defendants' counterclaim.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a plaintiff who fails to make a sufficient showing of the existence of an element essential to her case and on which she will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Curtis*, 710 F.3d at 594.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012).  The moving party, however, need not negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citing *Celotex*, 477 U.S. at 323; *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action." *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013).  "A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002); *accord Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-13).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Id.* (internal citations and quotations omitted); *Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011).

## III.   PLAINTIFF'S CLAIMS

### A.   Choice of Law

Plaintiff contends Ohio law applies to all of its claims, while Defendants contend that Texas law applies.  In diversity jurisdiction cases, such as this one, a district court generally applies the choice-of-law rules of the forum state.  *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014); *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 521 (5th Cir. 2001).  However, when a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the choice-of-law rules of the transferor court.  *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990); *Jackson*, 767 F.3d at 512.  Since this case was transferred from the Northern District of Ohio pursuant to § 1404(a), *see* Transfer Order, the Court applies Ohio choice-of-law principles.  Ohio has adopted the Restatement (Second) of Conflict of Laws, which requires a different choice-of-law analysis for contract and tort claims.  *See Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 208 (Ohio 2001); *Hagberg v. Delphi Auto. Sys.*, 268 F. Supp. 2d 855, 860 (N.D. Ohio 2002).  The Court first conducts the choice-of-law analysis for Plaintiff's breach of contract claim, then addresses what law applies to Plaintiff's tort claims.

### 1.    Choice of Law on Plaintiff's Contract Claim

### a.    The Agreement's Governing Law Clause

The dispositive issue regarding what law applies to Plaintiff's sole contract claim, a claim against Bogan for breach of the Agreement, is whether the Agreement's choice-of-law provision is enforceable under Ohio's choice-of-law rules.  The Agreement contains the following "Governing Law" clause: "The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio applicable to contracts made in that state."  Agreement, ¶ 20.  The parties do not dispute that this is a choice-of-law provision, and the Court concludes that it is.

"The Ohio Supreme Court in considering the deference to give contractual choice-of-law provisions has adopted the guidelines of the *Restatement (Second) of Conflict of Laws*, § 187(2) (1971) . . . ." *Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987) (citing *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 453 N.E.2d 683, 685-86 (1983)) (emphasis in original). Pursuant to the Restatement (Second) of Conflict of Laws §§ 187(2), 187(2)(a), and 187(2)(b), the Ohio Supreme Court has held that choice-of-law provisions are generally enforceable subject to two limited exceptions:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless [1] either the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or [2] application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.

*Jarvis v. Ashland Oil, Inc.*, 478 N.E.2d 786, 788 (Ohio 1985) (quoting *Shulke Radio Prods., Ltd.*, 453 N.E.2d at 684 (syllabus)) (alterations in original); *see also Sekeres v. Arbaugh*, 508 N.E.2d 941, 942 (Ohio 1987) (per curiam); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a), (b) (1971); *Tele-Save Merch. Co.*, 815 F.2d at 1122.  The Ohio Supreme Court favors enforcement of choice-of-law provisions and has held that "where the parties to a contract have made an effective choice of the forum law to be applied, the Restatement of the Law 2d, Conflict of Laws (1971) 561, Section 187(2), will not be applied to contravene the choice of the parties as to the applicable law." *Jarvis*, 478 N.E.2d at 787 (syllabus); *accord Tele-Save Merch. Co.*, 814 F.2d at 1122.

Here, the parties chose Ohio law to govern the Agreement.  Agreement, ¶ 20.
Plaintiff is incorporated and has its headquarters in Ohio.  *See* Amended Complaint,
¶ 1.[14]  Ohio, thus, has a substantial relationship to this case and there is a reasonable
basis for the parties' choice of Ohio law  *See Jarvis*, 478 N.E.2d at 788 (holding the
state of incorporation and principal place of business of one of the parties "clearly has
a substantial relationship to the parties"); *Sekeres*, 508 N.E.2d at 942 (finding a
substantial relationship existed between the chosen state and the parties under similar
circumstances).  Therefore, Ohio law, the governing law chosen by the parties, applies
unless this case falls under the second exception recognized by the Ohio Supreme
Court and Restatement § 187(2)(b).

Defendants rely on this second exception and argue that the Agreement's
choice-of-law provision should not apply because (1) applying Ohio law violates a
fundamental Texas public policy against enforcing non-compete agreements;
(2) Texas has a greater material interest in this issue than Ohio; and (3) in the absence
of the parties' choice, Texas law would apply under the factors set forth in
Restatement (Second) of Conflict of Laws § 188.  Defendants' Response, at 3-6;
Defendants' Reply, at 3-4.    Defendants' argument turns on whether or not
enforcement of Paragraph 6 of the Agreement, the "Non-Compete" clause, violates
a fundamental public policy of Texas.

### b.    Whether the Agreement Violates a Fundamental Public Policy in Texas

To determine if the parties' contractual choice of Ohio law should apply, the
Court first must decide if the Agreement violates a fundamental public policy of

---

[14]    Plaintiff also asserts McGowan gave "final approval" of the Agreement in Ohio. *See* Declaration of Laura McGowan dated Jan. 15, 2015 [Doc. # 120], at ECF page 5, ¶ 11; Agreement, at 11.

Texas.  "'In order for the chosen state's law to violate the fundamental policy of [the forum state], it must be shown that there are significant differences in the application of the law of the two states.'"  *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 362 (6th Cir. 1993) (quoting *Tele-Save Merch., Co.*, 814 F.2d at 1123) (alteration in original).  For the Court to set aside the parties' choice of Ohio law in favor of Texas law, Ohio law must be "repugnant to and in violation of the public policy of" Texas.  *See Jarvis*, 478 N.E.2d at 789; *Tele-Save Merch. Co.*, 814 F.2d at 1122.

Defendants argue that Paragraph 6 of the Agreement violates Texas public policy because Texas, unlike Ohio, requires non-compete clauses to be separately supported by adequate consideration and part of an otherwise enforceable agreement. Defendants' Response, at 5.  Defendants further contend that Paragraph 6 is an unenforceable non-compete clause because it does not contain time or geographic constraints.  *See id.*, at 12.  The disputed clause, Paragraph 6, states:

> **6.**   *Non-Compete*
>
> Furthermore, Employee agrees that he will never utilize the **Trade Secrets, Confidential Information**, or proprietary information of Employer to compete with Employer, nor disclose the **Trade Secrets, Confidential Information**, or proprietary information of Employer to any person, corporation, entity, or association which would allow that person, corporation, entity or association to compete with Employer.

Agreement, ¶ 6 (emphasis in original).

While Paragraph 6 purports to be a non-compete clause, it addresses only the use of confidential information, trade secrets, and proprietary information, and restricts a former employee's ability to compete only to the extent the former employee intends to use the employer's confidential information, trade secrets, and proprietary information.  Texas law similarly imposes a duty on employees not to use

a current or former employer's trade secrets and confidential and proprietary information acquired during the employment relationship in any manner adverse to the employer, even after the employment relationship has ended.  *See Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 961 (S.D. Tex. 2013) (and cases cited therein); *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 753 (Tex. App.–El Paso 2013, no pet.).  Paragraph 6, thus, extends only to conduct already prohibited by Texas through this common law duty.

Moreover, Paragraph 6 and Texas's common law duty are consistent with the distinctions between non-compete and non-disclosure agreements in Texas. Nondisclosure agreements are readily enforced in Texas and do not generally violate public policy.  *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011).  Non-disclosure covenants are generally not viewed as restraints on trade because these "covenants do not prohibit the former employee from using, *in competition with the former employer*, the *general* knowledge, skill, and experience acquired in former employment."  *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App.–Dallas 1992, no writ) (emphasis in original); *see also Brooks v. Excellence Mortg., Ltd.*, No. 04-13-00106-CV, 2014 WL 2434583, at *11 (Tex. App.–San Antonio May 30, 2014, no pet.).  Accordingly, because Paragraph 6 is limited to trade secrets, confidential information, and proprietary information, it complies with Texas law and does not violate a fundamental public policy of Texas regarding non-compete covenants. Paragraph 6 contains nothing that justifies setting aside the parties' choice of Ohio law.

Defendants next argue that Paragraph 6 is unenforceable because it incorporates the Agreement's overly broad definition of "trade secrets."  Defendants' Reply, at 4.

However, there is no substantial difference between Ohio and Texas law that warrants setting aside the parties' choice of governing law. Texas has adopted the Restatement of Torts' definition of trade secrets and defines a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l v. Atlai*, 918 S.W.2d 453, 455 (Tex. 1994) (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958); RESTATEMENT OF TORTS § 757 (1939)); *accord In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). For years, Ohio followed the Restatement's definition, but, currently defines "trade secret" a little differently under the Ohio Uniform Trade Secret Act ("OUTSA") § 1336.1(D)(1)-(2).[15] *See Al Minor & Assoc., Inc. v. Martin*, 881 N.E.2d 850, 853 (Ohio 2008). Despite the linguistic distinctions in the definitions, both the Texas Supreme Court and Ohio Supreme Court have adopted the Restatement of Torts' six factor test to determine whether a trade secret exists. *See In re Bass*, 113 S.W.3d 735, 739 (Tex.

---

[15]     OUTSA, OHIO REV. CODE § 1336.1(D)(1), (2), defines "trade secret" as:

(D)     "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1)     It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2)     It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2003); *Al Minor & Assoc., Inc.*, 881 N.E.2d at 853.  Although not identical, the definitions of trade secret in Ohio and Texas are not substantially different such that applying Ohio law would be repugnant to Texas public policy.  Defendants, thus, have failed to show that the parties' choice-of-law provision should be set aside because applying Ohio law would be "repugnant to and in violation of" a fundamental Texas public policy.  *See Jarvis*, 478 N.E.2d at 789; *Tele-Save Merch., Co.*, 814 F.2d at 1122-23.

Defendants fail to satisfy the first element of the Restatement § 187(2)(b) exception to enforcement of the parties' choice of law.  The Court does not need to reach the remaining elements in the § 187(2)(b) analysis.  *See Tele-Save Merch. Co.*, 814 F.2d at 1123.  The Agreement's choice-of-law clause is enforceable.  Ohio law, accordingly, applies to Plaintiff's breach of contract claim.

### 2.    Choice of Law on Plaintiff's Tort Claims

#### a.    The Agreement's Governing Law Clause

Plaintiff's other causes of action against Bogan for breach of the duty of loyalty and unjust enrichment, and against all Defendants for misappropriation of trade secrets, tortious interference with business relationships, and tortious interference with prospective business relationships, sound in tort law.  As an initial matter, the Court notes that these tort claims are not governed by the Agreement's choice-of-law provision.  The "Governing Law" clause states that only the "provisions of this Agreement" shall be governed by Ohio law.  Agreement, ¶ 20.  Defendants assert that the law applying to Plaintiff's breach of contract claim should also apply to Plaintiff's tort claims because, "[a]lthough the parties' choice of law provision is limited to contract claims, all of McGowan['s] claims stem from the Agreement between it and Bogan."  Defendants' Reply, at 5 n.3.  Defendants do not cite the Court to any

controlling authority in support of their argument.[16]  Furthermore, Defendants do not meaningfully explain why Plaintiff's tort claims in this case arise out of the Agreement.  The Court is unpersuaded by Defendants' position and will determine what law applies to Plaintiff's tort claims under Ohio's choice-of-law rules for tort causes of action.

> **b.**     **Whether Ohio or Texas Has the Most Significant Relationship to This Case**

"[I]n Ohio, a party may overcome the presumption that the law of the place where the injury occurs will be applied to a tort action, if it can demonstrate that another state has a more significant relationship to the action."  *Muncie Power Products, Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 874 (6th Cir. 2003); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146.  "In determining the State with the most significant relationship, Ohio courts consider: (1) 'the place of the injury'; (2) the location 'where the conduct causing the injury' took place; (3) 'the domicile, residence, . . . place of incorporation, and place of business of the parties'; (4) 'the place where the relationship between the parties . . . is located'; and (5) any of the factors listed in Section 6 of the Restatement (Second) of Conflict of Laws 'which the court may deem relevant to the litigation.'"  *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (quoting *Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286, 289 (Ohio 1984)); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS

---

[16]     Defendants mistakenly rely on an Ohio district court case, in which the district court held claims "arising from" the contract would be governed by the parties' contractual choice of Florida law.  *See Extracorporeal Alliance, L.L.C. v. Rostock*, 285 F. Supp. 2d 1028, 1039 (N.D. Ohio 2003).  However, in *Extracorporeal Alliance*, the district court held that Ohio law would govern all other claims, *i.e.*, those not arising from the contract, which included the plaintiff's tort claims for misappropriation of trade secrets and tortious interference.  *Id.* at 1041-43.

§ 145.  The § 6 Restatement factors are "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6(2)(a)-(g); *Pilgrim*, 660 F.3d at 946.

The parties have not meaningfully briefed the § 6 and § 145 Restatement factors.  Nevertheless, there is an extensive record, which the Court considers along with the parties' arguments on related issues.

Plaintiff contends that Ohio has the more significant relationship to this case because the injury to Plaintiff occurred in Ohio since Plaintiff is incorporated in Ohio and Plaintiff's principal place of business is there.  Response, at 14-16.  These arguments hark to the first and third § 145 Restatement factors, the place of injury and place of business of the parties.  However, the importance of these factors is outweighed by this case's substantial ties to Texas.  Nearly all of the conduct allegedly constituting the torts and causing the injuries occurred in Texas.  Bogan's actions during his last few weeks of employment took place either entirely or in substantial part in Texas.[17]  Bogan left McGowan to work for UMI in Texas.[18]  Defendants are all

---

[17]    *See* Bogan Decl., ¶¶ 4, 13 (noting that Bogan's work for McGowan primarily took place in Texas, and he was employed at the Dallas branch).  Indeed, as the transfer order from the Northern District of Texas noted, this case's ties to Ohio are so tenuous that it was unclear to the district judge whether personal jurisdiction existed over Defendants in Ohio.  *See* Transfer Order, at 4.

[18]    Bogan Decl., ¶ 15.

residents of Texas.[19]  While Plaintiff's principal place of business is in Ohio, Plaintiff regularly conducts business in Texas through its branch in Dallas.[20]  The parties' relationship was centered in Texas because Bogan worked at McGowan's Dallas branch.[21]  Finally, none of the § 6 Restatement factors contravene these strong Texas ties.  Accordingly, the Court concludes that Texas is the state with the most significant relationship to this case, and thus Texas law applies to Plaintiff's tort claims.

Having resolved the choice-of-law issues and concluded that Ohio law governs Plaintiff's breach of contract claim and Texas law applies to Plaintiff's tort claims, the Court turns to the merits of each of Plaintiff's claims.

## B.    Breach of Contract

Plaintiff sues Bogan for breach of the Agreement.  Amended Complaint, ¶¶ 39-45.  Both Plaintiff and Bogan move for summary judgment in its or his favor.  For the reasons explained above, Ohio law applies to this claim.  "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012).  Defendants argue that Bogan is entitled to summary judgment because (1) the Agreement is not enforceable; (2) even if it is enforceable, Bogan did not breach the Agreement; and (3) even if Bogan breached the Agreement, Plaintiff did not suffer any damages or loss as a result of that breach.  Plaintiff contends that the Court should find an enforceable agreement and that Bogan

---

[19]     *See* Amended Complaint, ¶¶ 2-6.

[20]     *See* Longo Decl. dated June 4, 2012, ¶¶ 3-5; *see also* Declaration of Christopher Longo dated Jan. 15, 2015 (Longo Decl. dated Jan. 15, 2015) [Doc. # 119-2], ¶¶ 3-5.

[21]     *See* Longo Decl. dated June 4, 2012, ¶¶ 3-5; Bogan Decl., ¶¶ 4, 13.

breached the Agreement as a matter of law.  Plaintiff argues that, at most, the scope of damages is the only issue remaining for trial.  The Court denies summary judgment to both parties, except as to unconscionability, because there are numerous genuine disputes of material fact on the element of breach, and because Plaintiff must file a more definite statement clarifying its theory of damages before the Court can reach this issue.

### 1.    Existence of a Contract

#### a.    Unconscionability

With regard to the first element, the existence of a contract, Defendants contend the Agreement is unenforceable because it is unconscionable.   In Ohio, unconscionability is a question of law and requires a two-prong showing: "'(1) substantive unconscionability, *i.e.*, unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.*, individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible.'" *Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 758 N.E.2d 1173, 1181 (Ohio Ct. App. 2001) (quoting *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.*, 680 N.E.2d 240, 243 (Ohio Ct. App. 1996)); *see also Scovill v. WSYX/ABC*, 425 F.3d 1012, 1017 (6th Cir. 2005).   Both elements must be present to find a contract unconscionable.   *Scovill*, 425 F.3d at 1017; *Jeffrey Mining*, 758 N.E.2d at 1181. Defendants, as the party asserting unconscionability, have the burden of proving that the Agreement is unconscionable.  *Wells Fargo Bank, N.A. v. Lee*, 20 N.E.3d 1236, 1248 (Ohio Ct. App. 2014).   Because the Court concludes below, as  a matter of law, that the Agreement was not procedurally unconscionable, the Court does not reach the issue of substantive unconscionability.  *See Scovill*, 425 F.3d at 1018.

For procedural unconscionability, "Ohio courts look to 'factors bearing on the relative bargaining position of the contracting parties, including their age, education,

intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible.'" *Id.* at 1017 (quoting *Cross v. Carnes*, 724 N.E.2d 828, 837 (1998)). Procedural unconscionability exists if there was such a vast disparity in the bargaining power that no voluntary meeting of the minds was possible. *Id.*; *Bowie v. Clear Your Debt, LLC*, 523 F. App'x 315, 316 (6th Cir. 2013). "'The crucial question is whether each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print . . . ?'" *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 666 (6th Cir. 2003) (en banc) (quoting *Ohio Univ. Bd. of Trustees v. Smith*, 724 N.Ed.2d 1155, 1161 (Ohio Ct. App 1999)) (internal quotation marks omitted) (alteration in original).

Defendants assert the Agreement is procedurally unconscionable because Bogan signed the Agreement after he began his employment with McGowan, "did not negotiate any of the terms of the Agreement," and he "was instructed by Chris Longo that all McGowan & Statehouse employees must sign the Agreement."[22]  Although Bogan was required to sign the Agreement, there is no evidence that he was required to sign the Agreement as then written.  Ohio courts have consistently held that procedural unconscionability does not exist when there is undisputed evidence that a party had the opportunity to review the terms of the contract before signing and was sophisticated and educated enough to understand the terms.  *See Hedeen v. Autos Direct Online, Inc.*, 19 N.E.3d 957, 967 (Ohio Ct. App. 2014).  In *Hedeen*, the court explained,

There is no evidence in the record that [plaintiff], who is a second-grade

---

[22]     Bogan Decl., ¶ 6.

teacher, was prevented from reading the contract before signing or that she was incapable of understanding the document based on some mental or physical impairment.  Further, [defendant] emailed all of the purchase documents to her.  As a result, there was no salesperson standing over her, directing her to quickly sign the documents.  [Plaintiff] had time to read the documents she was signing.  If a person can read and is not prevented from reading what he signs, he alone is responsible for reading what he signs . . . .  [Plaintiff] contends she "was given the impression" that if she wanted to purchase the vehicle, she had to sign all of the documents that were emailed to her "without making any changes." However, there is no evidence that she attempted to negotiate or alter any of the terms of the agreement.  Based on foregoing, we find that she has not met her burden of establishing that the arbitration agreement was procedurally unconscionable.

*Id.* (internal citations and quotation marks omitted).  In *Bowie*, the Sixth Circuit applying Ohio law stated:

Boiled down to its essence, [plaintiff's] argument is this: She felt pressured to sign the contract because of the speed with which [defendant's] employee explained the contract to her, and further, because the employee failed to mention the arbitration clause.  But presumably, and as the district court found, [plaintiff], as a single-mother who runs a household and has her associate's degree in nursing, was capable of asking for more time to read the contract and was capable of understanding the arbitration clause had she read it.  Neither her failure to read the contract, nor the employee's failure to mention the arbitration clause, renders the contract procedurally unconscionable . . . .  Finally, this was not a situation where [plaintiff] had no choice but to accept the contract.  She could have tried to negotiate the arbitration provision or she could have gone to another debt services company.  She did neither.

*Bowie*, 523 F. App'x at 316.  In *Vanyo v. Clear Channel Worldwide*, the Ohio court explained,

Although the bargaining power may not have been equal in this case, we cannot say that [plaintiff] was a victim of procedural unconscionability. Mere inequality of bargaining power is insufficient to invalidate an

otherwise enforceable arbitration agreement.  Moreover, nothing in the record before us allows us to conclude that [plaintiff] was unaware of the impact of the agreement or that she was otherwise limited in understanding its impact.  Indeed, the agreement itself contains an acknowledgment that [plaintiff] had "been given the opportunity to discuss this agreement with [her] private attorney."  Accordingly, on these facts, we find that there was no procedural unconscionability.

808 N.E.2d 706, 713 (Ohio Ct. App. 2004) (citations omitted).  *See Morrison*, 317 F.3d at 667 ("Although the bargaining power was not equal, and the contract was drafted by [the defendant] and was apparently not open to negotiation, we do not suppose that Ohio courts would find this highly educated plaintiff, who graduated from the Air Force Academy and held a master's degree in administration, a victim of procedural unconscionability."); *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1300 (Ohio Ct. App. 1993) ("[Plaintiff] is a Harvard graduate, with extensive business and contracting experience.  He admits he saw the limitations clause, but failed to read its contents.  Therefore, he did not attempt to negotiate for less onerous terms, and the record does not indicate whether he could have obtained such terms had he tried.  Assuming *arguendo*, that he could have not have bargained with [the defendant] to alter the terms of its limitations clause, this inability alone is insufficient to establish procedural unconscionability."); *Corp. Commc'n Servs. of Dayton, LLC v. MCI Commc'n Servs., Inc.*, No. 3:08-CV-046, 2009 WL 3756274, at *22 (S.D. Ohio Nov. 9, 2009) (upholding commercial contract signed by the company's owner because the owner "is well-educated and well-experienced in his profession, has experience in regularly dealing with commercial contracts, and had read and studied the contracts at issue here before signing them.  Finally, he was under no compulsion to sign any of the agreements.").

As in these Ohio cases holding no procedural unconscionability, there is no

evidence that Bogan was unable to ask questions, negotiate terms, or have an attorney review the Agreement. Indeed, Plaintiff provides a copy of the email Longo sent Bogan:

> As you know from our conversations with Linc, all McGowan & Statehouse employees must sign a "Trade Secrets" agreement. Can you review the attached and sign?
>
> Any questions, let us know.[23]

Longo states he does not recall Bogan asking him any questions about the Agreement.[24] Thus, while Bogan may have chosen not to question or negotiate any terms of the Agreement, the record reveals that he had the opportunity to do so.

Moreover, Bogan was sophisticated. When he signed the Agreement in 2006, he had been working as a wholesale insurance broker for nearly thirty years and recently had started with McGowan as the company's Dallas branch manager.[25] Given the nature of Bogan's work, management skills, and his extensive experience in the insurance industry, he possessed the necessary training, knowledge, and sophistication to understand the Agreement and to ask questions. Defendants have failed to meet their burden and raise a genuine fact dispute regarding procedural unconscionability. The Court therefore concludes, as a matter of law, that the Agreement was not procedurally unconscionable and is generally enforceable.

### b.     Enforceability of Attorneys' Fees Provision

Defendants also argue that Paragraph 27 of the Agreement is unenforceable and

---

[23]     Exhibit E to Response (Email from Chris Longo dated Mar. 12, 2006) [Doc. # 119-2], at ECF page 34; *see also* Longo Decl. dated June 4, 2012, ¶ 7.

[24]     Longo Decl. dated June 4, 2012, ¶ 8.

[25]     Bogan Decl., ¶¶ 4, 21; *see also* Longo Decl. dated June 4, 2012, ¶ 2.

that McGowan cannot recover attorneys' fees on its breach of contract claim. Defendants' Motion, at 31.  Defendants contend (1) Paragraph 27, the Agreement's attorneys' fees provision, is unconscionable and (2) the provision is an unenforceable penalty.[26]  Defendants do not offer any additional evidence or arguments as to why this particular provision is unconscionable.  For the reasons explained above, the Agreement, including the attorneys' fees provision, is not procedurally unconscionable, and thus, under Ohio law, the Agreement, including the attorneys' fees provision, is not unenforceable on this basis.

Regarding Defendants' second argument, until recently Ohio courts and the Sixth Circuit applying Ohio law precluded contractual recovery of attorneys' fees unless the attorneys' fees provision was specifically negotiated.  *See Big Lots Stores, Inc. v. Luv N' Care, Ltd.*, 302 F. App'x 423, 426 (6th Cir. 2008) (and cases cited therein).  Relying on this line of cases, Defendants contend the attorneys' fees

---

[26]     Paragraph 27 of the Agreement states:

> **27.    *Equitable Relief***
>
> Recognizing that irreparable injury will result to Employer, its business and property, in the event of a breach of this Agreement by Employee, and that Employee's employment is based primarily on this Agreement, the parties hereto agree that in the event of any actual or threatened breach of the provisions of [sic] this Agreement by the Employee, Employer shall be entitled, in addition to any other remedies and damages available, to injunctive relief (temporary or otherwise) to restrain the violation thereof.
>
> If Employer prevails in such an action, Employer shall be entitled to recover from Employee all costs associated with such action, including, without limitation, reasonable and necessary attorney's fees.

Agreement, ¶ 27 (emphasis in original).

provision was not specifically negotiated here, and thus is unenforceable.  *See* Defendants's Reply, at 24 & n.10.  Very recently the Sixth Circuit abrogated this line of cases.  *See Allied Indus. Scrap, Inc. v. OmniSource Corp.*, 776 F.3d 452 (6th Cir. 2015), *abrogating Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781 (6th Cir. 2005).  In *Allied Industrial Scrap*, the Sixth Circuit held that unilateral or one-sided fee shifting provisions, such as the one at issue here, are generally enforceable under Ohio law, based on *Wilborn v. Bank One Corp.*, 906 N.E.2d 396 (Ohio 2009), a case in which the Ohio Supreme Court upheld a one-sided, fee-shifting provision in a bank's contract for a home equity loan.  *Id.* at 453.  In *Wilborn*, the Ohio Supreme Court reasoned that absent any evidence of unconscionability, duress, or public policy to the contrary, "agreements to pay another's attorney fees are generally 'enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case.'"  *Wilborn*, 906 N.E.2d at 400-01 (quoting *Nottingdale Homeowners' Ass'n., Inc. v. Darby*, 514 N.E.2d 702, 702 (Ohio 1987) (syllabus)).  Thus, under current Ohio law, one-sided fee-shifting provisions are generally enforceable subject to limited exceptions not applicable here.  *See id.*; *Allied Indus. Scrap*, 776 F.3d at 453.  Accordingly, should Plaintiff prevail at trial on its breach of contract claim, Plaintiff would be entitled under Paragraph 27 to recover fair, just, and reasonable attorneys' fees.[27]

### c.    Enforceability of Paragraph 6

Finally, Defendants argue that the entire Agreement is unenforceable because Paragraph 6 is an unenforceable non-competition clause.  Defendants cite only Texas

---

[27]    On the other hand, because Ohio law applies to Plaintiff's breach of contract claim, Plaintiff's claim for attorneys' fees pursuant to § 38.001 of the Texas Civil Practices and Remedies Code, Count VII of the Amended Complaint, is **dismissed** as **moot**.

cases.  To the extent Defendants' argument is based on Texas law, this argument is rejected because Ohio law applies to Plaintiff's breach of contract claim.

The Court, for the sake of completeness, considers Defendants' argument as if asserted under Ohio law.  Under that law, "a non-compete clause's enforceability is a matter of law for the court."  *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 990 (6th Cir. 2007).

"[A] noncompete covenant is enforceable to the extent it is reasonable." *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 525 (6th Cir. 2013) (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 544 (Ohio 1975) (syllabus)).  The Ohio Supreme Court has held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde*, 325 N.E.2d at 545 (syllabus); *accord Chi. Title Ins. Corp.*, 487 F.3d at 991.

To determine the reasonableness of a non-compete covenant, Ohio courts consider:

> Whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and expertise, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 547); *accord MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 963 (N.D. Ohio 2009).  "In determining the validity of a covenant or agreement in

restraint of trade, each case must be decided on its own facts." *Raimonde*, 325 N.E.2d at 547; *accord Chi. Title Ins. Corp.*, 487 F.3d at 991. The burden is on the party seeking to enforce the covenant to provide clear and convincing evidence that the covenant is reasonable.  *Chi. Title Ins. Corp.*, 487 F.3d at 991; *Century Bus. Servs., Inc. v. Barton*, 967 N.E.2d 782, 795 (Ohio Ct. App. 2011); *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988).

Finally, Ohio law empowers courts to modify or amend non-compete covenants to achieve reasonable results.  *Chi. Title Ins. Corp.*, 487 F.3d at 991; *Raimonde*, 325 N.E.2d at 547.  Ohio law also recognizes that an unenforceable provision may be severed from an otherwise enforceable contract if severance would be consistent with the intent of the parties.  *See Ignazio v. Clear Channel Broad., Inc.*, 865 N.E.2d 18, 20 (Ohio 2007); *Morrison*, 317 F.3d at 674-75; *Toledo Police Patrolmen's Ass'n, Local 10, IUPA v. Toledo*, 641 N.E.2d 799, 803 (Ohio Ct. App. 1994).

The disputed "non-compete" clause, Paragraph 6 of the Agreement, prohibits Bogan's use of McGowan's trade secrets, confidential information, or proprietary information to compete with McGowan.  *See* Agreement, ¶ 6 (quoted above). Paragraph 5 of the Agreement, the "Non-Disclosure" covenant, also restricts Bogan's use of trade secrets, confidential information, and proprietary information.[28]  When

---

[28]     Paragraph 5 of the Agreement states:

> **5.    *Non-Disclosure of Trade Secrets, Confidential Information & Proprietary Information***
>
> Employee agrees that he will **NEVER** communicate, divulge, or disclose **Trade Secrets, Confidential Information**, or proprietary information of Employer, either during the course of his employment or at any point after the termination thereof, to any person, corporation, entity (governmental or otherwise), or association not authorized *in*
>
> (continued...)

Paragraphs 5 and 6 are read together, it is clear that the primary objective of the Agreement is to prevent a McGowan or affiliates' employee's use of his employer's confidential information, trade secrets, and proprietary information. Paragraph 6 does little more than Paragraph 5. Each seek to protect misuse of McGowan entities' confidential, trade secret, and proprietary information.

Under Ohio law, "[a]n employee possessed of his former employer's trade secrets '[has] the right to take employment in a competitive business, and to use his knowledge (other than trade secrets) and experience, for the benefit of the new employer.'" *Hydrofarm, Inc. v. Orendorff*, 905 N.E.2d 658, 345-46 (Ohio Ct. App. 2008) (quoting *B.F. Goodrich v. Wohlgemuth*, 192 N.E.2d 99, 105 (Ohio Ct. App. 1963)) (second alteration in original). Ohio courts, however, protect an employer

---

[28]      (...continued)

> *writing* by the president of Employer (not the president of any subsidiary of Employer) to receive disclosure of such Trade secrets.
>
> a.    This provision shall not preclude the Employee from:
>
> (i)    performing his job duties for Employer;
>
> (ii)    communication or using information known generally to the public after the termination of Employee's employment by Employer, other than as a result of Employee's violation of a confidentiality obligation imposed by this Agreement or force of law; or,
>
> (iii)    making any disclosure required by a court of law or governmental or regulatory authority order or decree; provided that Employee shall not make any such disclosure without first giving Employer notice of his intention to make that disclosure in order for Employer to have an opportunity to interpose an objection to the disclosure.

Agreement, ¶ 5 (emphasis in original).

against a former employee's potential misuse of trade secrets through the "inevitable use" or "inevitable disclosure" doctrine.  That doctrine provides "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002); *see also Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio. Ct. App. 2002); *Devicor Med. Products, Inc. v. Reed*, No. 1:11CV645, 2013 WL 1315037, at *18 (S.D. Ohio Mar. 29, 2013) (Dlott, J.); *Exal Corp. v. Roeslein & Assocs., Inc.*, No. 4:12cv1830, 2013 WL 6843022, at *4 (N.D. Ohio Dec. 27, 2013) (Pearson, J.); *MP TotalCare Servs.*, 648 F. Supp. 2d at 968-69.  Given these strongly embedded protections under Ohio law, the Agreement's non-compete covenant is reasonable and enforceable under Ohio law to the extent Paragraph 6 is limited to an employee's use of trade secret, proprietary, and confidential information.

Defendants also contend Paragraph 6 is unenforceable because it incorporates an overly broad definition of "trade secrets" and "confidential information."[29]  This

---

[29]    *See* Defendants' Reply, at 5.  Paragraph 23 of the Agreement defines "confidential information" and "trade secrets" as follows:

(a)    ***Confidential Information***.
Confidential Information shall be defined to mean any information about employer which is not generally available to the public.
\*         \*         \*         \*
(h)    ***Trade Secrets.***
Trade secrets shall be defined to mean highly confidential, non-public information or Employer, the nondisclosure of which is integral and critical to the business success of Employer.

(continued...)

argument about the breadth of the Agreement's definition of trade secret, proprietary, and confidential information raises a genuine fact dispute between the parties regarding whether the information actually at issue in this case constitutes protectable information.   Once the jury determines at trial what information, if any, was improperly used by Bogan, then the Court will assess whether that information qualifies as a trade secret, or proprietary or confidential information.  Furthermore, even if the Court were to find that Paragraph 6 was unreasonable to the extent it

---

[29]      (...continued)

> **Trade secrets** shall be further defined to include, amongst other things: (i) the operational structures of Employer's insurance programs; (ii) the eligibility criteria for potential insureds in Employer's insurance products and programs; (iii) the pricing structure of Employer's insurance products and prograns (i.e.–the rates charged to insureds in Employer's products and programs); (iv) the names, addresses, telephone numbers, fax numbers, e-mail addresses, and any other information about any of Employer's insureds; (v) underwriting information related to any of Employer's insureds; (vi) the expiration dates of insurance policies, evidences, or certificates; (vii) financial information about Employer; (viii) the volume of business underwritten by Employer; (ix) the reinsurers of Employer's insurance products and programs; (x) the number of employees of Employer; (xi) the names, addresses, telephone numbers, fax numbers, e-mail addresses, and any other information about any of Employer's retain agents, agencies, brokers, or brokerages; (xii) any work product, intellectual property, or other information developed or generated by Employee while in the employment of Employer; and, (xiii) any other information which is not generally known about Employer, including, but not limited to, its operations, products suppliers, markets, sales, employees, costs, profits, business relationships, customers' needs, clients, insureds, finances, business activities, insurance agencies, insurance agents, insurance brokers, insurance brokerages, or other information acquired disclosed, or made known to Employee before, during or after Employee's employment by Employer.

Agreement, ¶ 23(a), (h) (emphasis in original).

covers conduct or information beyond what is protected by Ohio trade secret law—an issue the Court does not reach here—the Court retains the power to either modify Paragraph 6 to make it reasonable and enforceable or to sever that paragraph, and thus render the Agreement enforceable.  Defendants' arguments regarding Paragraph 6, therefore, do not provide grounds for finding the entire Agreement unenforceable.

Defendants' contention that a valid contract does not exist between Bogan and Plaintiff is rejected.

### 2.    Breach

Plaintiff contends that Bogan breached Paragraphs 5, 6, 7, and 36 of the Agreement.  The parties raise highly fact-dependent arguments regarding whether Bogan breached any of the provisions of the Agreement.  Accordingly, the Court concludes that summary judgment is not appropriate for either party on this element of Plaintiff's contract claim.

### a.    Paragraphs 5 and 6

There is a genuine dispute of material fact regarding whether any of Plaintiff's information rises to the level of trade secret, confidential, or proprietary information. There also is a genuine fact dispute whether Bogan's use of this information constitutes a violation of Paragraph 5, which restricts an employee's ability to disclose McGowan's trade secret, confidential, and proprietary information, or a violation of Paragraph 6, which prohibits an employee from using McGowan's trade secrets, confidential information, and proprietary information to compete with McGowan. *See* Agreement, ¶¶ 5, 6.

Plaintiff argues Bogan breached Paragraphs 5 and 6 of the Agreement by using Plaintiff's confidential information to send emails soliciting business from Plaintiff's customers and brokers, to divert business and quotes away from Plaintiff, and to build

a book of business for his new employer, UMI.  Plaintiff's Reply, at 3; Plaintiff's Motion, at 23.  Plaintiff directs the Court to evidence such as emails from Bogan, the "Production Analysis" for UMI from January 1, 2011 to September 30, 2013, and Defendants' responses to Plaintiff's requests for admissions.[30]  Defendants counter that Bogan used his prior contacts and public information, not any of McGowan's confidential information or trade secrets to send emails, and that Bogan did not direct any viable business away from McGowan.[31]  Defendants also dispute whether any business Bogan actually wrote at UMI was derived from McGowan confidential information.[32]  The parties' arguments regarding whether Bogan breached Paragraphs 5 and 6 of the agreement are replete with material and genuine fact disputes. Summary judgment is denied for both parties on this issue.

### b.    Paragraph 7 of the Agreement

Plaintiff also contends Bogan breached Paragraph 7, the "Non-Disparagement" provision of the Agreement,[33] by sending emails to McGowan's contacts and brokers

---

[30]    *See* Exhibit T to Plaintiff's Motion (Emails from Bogan) [Doc. # 112-1], at ECF pages 3-24; Exhibit I to Plaintiff's Motion (Email from Bogan dated July 26, 2011) [Doc. # 111-6], at ECF page 9; Exhibit V to Plaintiff's Motion ("UMI's Production Analysis") [Doc. # 112-1], at ECF page 35; Responses and Objections to Plaintiff's First Set of Requests for Admissions to Defendant Roger Bogan [Doc. # 111-10], at ECF page 4.

[31]    *See* Defendants' Response, at 13-15; Bogan Decl., ¶¶ 23-24.

[32]    Defendants' Motion, at 6 (citing Exhibit E to Defendants' Motion (Oral Deposition of Ray Baldwin) [Doc. # 107], at ECF page 7).

[33]    Paragraph 7 of the Agreement states:

### 7.    *Non-Disparagement*

Employee agrees that he will never make, directly or indirectly, a

(continued...)

that contained "disparaging comments." Plaintiff's Motion, at 24. The specific emails Plaintiff points to contain statements such as "it's not clear right now if McGowan will close the Dallas office or keep a downsized skeleton crew," and "I've told them [McGowan] that the unique relationship I've had with wholesalers like yourselves might just evaporate upon my leaving."[34]

Defendants assert that Bogan's statements do not rise to the level of a "disparaging comment" because the emails "correctly expressed concern about the future of McGowan" and were either sent by Bogan at Longo's instruction or were

---

[33]     (...continued)

> **Disparaging Comment** about Employer to any person, corporation, entity (governmental or otherwise) or association.

Agreement, ¶ 7 (emphasis in the original). Paragraph 23 of the Agreement defines "disparaging comment" as follows:

                    *       *       *       *

**b.**     *Disparaging Comment*

> **Disparaging Comment** shall be defined to mean any written or oral statement communicated to a **Third Party** which disparages, denigrates, ridicules, or criticize[s] Employer, or which would cause that **Third Party** to think poorly of or negatively about Employer, whether or not such statement is true or false.

> A **Disparaging Comment** shall be further defined to include a statement considered under the law to be: (i) libel; (ii) slander; or (iii) defamation.

Agreement, ¶ 23(b) (emphasis in original).

[34]     *See* Exhibit F to Plaintiff's Motion (Email from Bogan dated July 15, 2011) [Doc. # 111-6, at ECF page 5; Exhibit T to Plaintiff's Motion [Doc. # 112-1], at ECF page 5.

sent by Bogan to maintain his longstanding relationships with clients.[35]  The definition of a "disparaging comment" is subjective and requires the trier of fact to determine if the comment "would cause" a third party "to think poorly of or negatively about [McGowan], whether or not such statement is true or false."  *See* Agreement, ¶ 23(b). There is a genuine dispute of material fact regarding whether Bogan made a "disparaging comment" in violation of Paragraph 7.  Neither party is entitled to summary judgment on this issue.

### c.   Paragraph 36 of the Agreement

Finally, Plaintiff contends that Bogan breached Paragraph 36 by failing to devote "100% of his business time" to McGowan.[36]  Plaintiff's Motion, at 24-25. Bogan's last day of employment with McGowan was August 5, 2011.[37]  Plaintiff has provided a detailed breakdown of all the acts Bogan allegedly committed for his personal benefit or on behalf of UMI or SBI during his final weeks of employment with McGowan, including allegedly soliciting business for UMI or SBI, diverting business away from McGowan, and using McGowan resources to set up his new

---

[35]   Defendants' Response, at 19-20 (citing Bogan's deposition testimony and declaration in support).

[36]   Paragraph 36 states:

> **36.   *Complete Devotion***
> Employee agrees that he shall devote 100% of his business time to Employer and shall dedicate himself to making Employer as successful as possible.  If Employee desires to obtain a second job, Employee must first obtain the written permission of the Chief Executive Officer of the subsidiary of Employer for which he works.

Agreement, ¶ 36 (emphasis in original).

[37]   Longo Decl. dated June 4, 2012, ¶ 16; Exhibit C to Defendants' Motion (Oral Deposition of Robert F. Bogan) [Doc. # 102], at ECF page 18.

business at UMI.  Plaintiff's Reply, at 7-9; Plaintiff's Motion, at 24-25.  The majority of evidence supporting Plaintiff's arguments is in the form of emails Bogan sent or received.[38]   Additionally, Plaintiff submits deposition testimony from Bogan discussing meetings he attended, apparently not on behalf of McGowan, on July 26 and 27, 2011, a "Search for Issuing Carrier Agreement and Binding Authority Universal Managers, Inc." that Bogan apparently signed on behalf of UMI on July 22, 2011, and employment forms suggesting Bogan began working for SBI in July 2011.[39]

While this evidence is weighty, Defendants point to genuine fact issues pertaining to many of these documents.  For instance, most of the emails in which Bogan allegedly "solicits" clients are challenged by Defendants through Bogan's testimony that the emails were sent at Longo's direction.  Bogan Decl., ¶ 14.  Bogan also asserts that the business he diverted from McGowan could never have been written by the company.  *Id.*, ¶ 18.  Defendants further dispute when Bogan began his employment with UMI.[40]  Furthermore, Defendants argue that time Bogan may not

---

[38]   *See e.g.*, Exhibit F to Plaintiff's Motion [Doc. # 111-6], at ECF page 5; Exhibit H to Plaintiff's Motion [Doc. # 111-6], at ECF pages 9-16; Exhibit I to Plaintiff's Motion [Doc. # 111-6], at ECF page 9; Exhibit K to Plaintiff's Motion [Doc. # 111-6], at ECF page 27; Exhibit R to Plaintiff's Motion [Doc. # 111-10], at ECF pages 12-37; Exhibit T to Plaintiff's Motion [Doc. # 112-1], at ECF pages 3-24; Exhibit G to Plaintiff's Response [Doc. # 119-3], at ECF pages 7-12; Exhibit N to Plaintiff's Response [Doc. # 119-3], at ECF pages 38-40; Exhibit 2 to Exhibit U to Plaintiff's Response [Doc. # 119-6], at ECF pages 25-29; Exhibit 3 to Exhibit X to Plaintiff's Response [Doc. # 120], at ECF pages 39-40.

[39]   *See* Exhibit B to Plaintiff's Motion [Doc. # 111-3], at ECF pages 20-21; Exhibit K to Plaintiff's Motion ("Frates Agreement") [Doc. # 111-6], at ECF page 6; Exhibit U to Plaintiff's Motion [Doc. # 112-1], at ECF pages 26, 31, 32.

[40]   *See* Bogan Decl., ¶ 15 ("In August 2011, I began working for [UMI] in Texas."); Baldwin Decl., ¶ 5 ("I understand Mr. Bogan was hired by [UMI] in approximately August 2011 to work in Texas.  Mr. Bogan is not currently, nor has he ever been, an
(continued...)

have devoted to McGowan was minimal and was insufficient to amount to a breach of the Agreement.[41]  This evidence and conflicting arguments present credibility issues and require subjective judgments best resolved at trial.  The Court concludes that summary judgment is not appropriate for either party on the issue of whether or not Bogan breached Paragraph 36 of the Agreement.

### 3.    Damages

Defendants contend Plaintiff has provided no evidence of any damages suffered as a result of Bogan's alleged misconduct.  Defendants' Motion, at 21-24; Defendants' Reply, at 13-15.  Plaintiff does not clarify under what legal theory it is pursuing damages, and has not clearly articulated what damages resulted from any specific alleged breach of the Agreement, both of which Plaintiff must do at trial.  Defendants, however, have failed to establish entitlement to summary judgment under Ohio damages law.  The Court declines to grant summary judgment for either party.

Plaintiff's damages arguments relate to business Bogan allegedly diverted from McGowan to UMI and/or SBI, revenue McGowan allegedly lost due to Bogan, and business UMI allegedly gained after Bogan began working there.  It is unclear whether Plaintiff simply seeks lost profits damages or intends some other measure of

---

[40]    (...continued)
employee of [SBI].").

[41]    *See* Defendants' Response, at 21; Reply, at 12.  Ohio courts have held that "[m]ere nominal, trifling, or technical departures will not result in a breach of contract." *Watershed Mgmt. v. Neff*, 20 N.E.3d 1011, 1020 (Ohio Ct. App. 2014); *accord Ohio Farmers' Ins. Co. v. Cochran*, 135 N.E. 537, 537 (Ohio 1922) (syllabus); *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007).  It is noted that Plaintiff asserts that Bogan "admits he did not devote all of his business time to McGowan as required by the Agreement."  *See* Plaintiff's Motion, at 26.  However, Plaintiff cites to Bogan's deposition testimony that states, "I gave them [McGowan] 150 percent for the five years I was there," but argues he did not do so from July 2011 to August 2011. Exhibit B to Plaintiff's Motion [Doc. # 111-3], at ECF page 41.

damages.[42]  In Ohio, "the nonbreaching party [to a contract] is entitled to a recovery of lost profits as consequential damages if he is able to prove: '(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.'"  *Kosier v. DeRosa*, 862 N.E.2d 159, 165 (Ohio Ct. App. 2006) (quoting *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883, 887 (Ohio 1984)); *accord Kehoe Component Sales. Inc. v. Best Lighting Products, Inc.*, 933 F. Supp. 2d 974 1007, n.33 (S.D. Ohio 2013).  For the third element, "both the existence and the amount of lost profits must be demonstrated with 'reasonable certainty.'"  *AGF, Inc. v. Great Lakes Heat Treating, Co.*, 555 N.E.2d 634, 640 (Ohio 1990); *accord City of Gahanna v. Eastgate Props., Inc.*, 521 N.E.2d 814, 818 (Ohio 1988).  "[D]amages are not awarded merely on a plaintiff's assertion 'that it would have made a particular amount of profits, but [the plaintiff] must prove lost profits with calculations based on facts.'"  *Ask Chems., LP v. Computer Packages, Inc.*, No. 14-3041, 2014 WL 6911574, at *5 (6th Cir. Dec. 10, 2014) (second alteration in original) (quoting *UZ Engineered Products Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1068, 1084 (Ohio Ct. App. 2001)); *accord Gahanna*, 521 N.E.2d at 818; *Endersby v. Schneppe*, 596 N.E.2d 1081, 1084 (Ohio Ct. App. 1991).  "[D]emonstrating lost profits to a reasonable certainty requires the use of detailed evidence, for example, 'expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.'"  *Ask Chems., LP*, 2014 WL 6911574, at *5 (quoting *AGF, Inc.*, 555 N.E.2d at 640); *see also Endersby*, 596 N.E.2d at 1083

---

[42]     Plaintiff refers only to "losses in revenue," lost "opportunity to get the business," and revenue UMI gained.  *See* Plaintiff's Response, at 23-24; Reply, at 4, 15, n.24, 18, n.29.

("Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative and uncertain." (citations and quotation marks omitted)).

Plaintiff asserts McGowan suffered "a decrease in the dollar amounts of business written with certain brokers who Bogan improperly solicited with his disparaging emails."[43]   Plaintiff, however, does not explain how much business McGowan allegedly lost *due to* Bogan's breaches of the Agreement.  Plaintiff proffers evidence it argues shows that Bogan used McGowan trade secrets (customer lists) to "build a book of business" at UMI worth $2,246,909.46.[44]  Defendants raise a genuine dispute of fact by countering with evidence that Bogan only wrote five pieces of

---

[43]   *See* Plaintiff's Response, at 24.  As support for lost profits, Plaintiff directs the Court generally to copies of the emails Bogan sent allegedly soliciting McGowan's customers to leave with him and to Longo's conclusory statement that "McGowan saw a decrease in the dollar amounts of business written with certain brokers who Bogan improperly solicited with his emails."  Longo Decl. dated Jan. 15, 2015, ¶ 23; Exhibit Y to Plaintiff's Response (Emails from Bogan) [Doc. # 120-1], at ECF pages 4-24.

[44]   Plaintiff's Response, at 24.  In support, Plaintiff provides emails Bogan sent allegedly using McGowan confidential information to solicit business, and Plaintiff directs the Court to two "Production Analyses" it claims shows the more than $2 million dollars worth of business Bogan helped to procure for UMI, including business from some of the McGowan customers Bogan allegedly used McGowan confidential information to solicit.  *See* Exhibit V to Plaintiff's Motion [Doc. # 112-1], at ECF page 35; Exhibit BB to Plaintiff's Response [Doc. # 120-1], at ECF pages 37-43; Exhibit Y to Plaintiff's Response [Doc. # 120-1].  Contrary to Defendants' assertions, Plaintiff also claims McGowan could have earned a commission on the "Insurisk" quote (also referred to in the record as the "Holy Family" quote) that Bogan allegedly diverted from McGowan to UMI.  Longo Decl. dated June 4, 2012, ¶¶ 19-20.  UMI apparently earned on this quote a "total net amount of revenue of $450 based on a 5% net retained on a $9,000 premium."  Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants [Doc. # 111-9], at ECF page 14 (answer to interrogatory no. 17).

business while an employee of UMI, and four of these were referred by SBI.[45] Because of these and other issues regarding admissibility of the evidence on which Plaintiff relies to establish damages, the Court cannot determine as a matter of law the sufficiency of proof of Plaintiff's damages.

Plaintiff is required to file a more definite statement clarifying its damages theories and identifying the supporting evidence produced through discovery or initial disclosures as timely supplemented by the parties. Defendants may challenge this proof of damages through a new summary judgment motion.

To conclude on Plaintiff's breach of contract claim, the Court decides as a matter of law that the Agreement is not unconscionable and is generally enforceable as explained above. But, there are numerous genuine disputes of material fact on the element of breach precluding summary judgment for Plaintiff or Bogan. Summary judgment is also denied for both parties on the issue of damages because the record is inadequate to decide the issue or the existence of recoverable damages under Ohio law.

## C.     Misappropriation of Trade Secrets

Plaintiff sues all Defendants for misappropriation of trade secrets. Amended Complaint, ¶¶ 30-38. In Ohio, misappropriation of trade secrets is a statutory cause of action under the Ohio Uniform Trade Secrets Act ("OUTSA"). *See* OHIO REV.

---

[45]     *See* Exhibit E to Defendants' Motion (Oral Deposition of Ray Baldwin) [Doc. # 107], at ECF page 7. It is noted that the evidentiary record is unclear regarding when Bogan's employment with UMI ended. Defendants state "Bogan ultimately resigned from UMI on September 30, 2013," apparently because of lack of production and/or he found another job. Defendants' Motion, at 7; Exhibit D to Defendants' Motion [Doc. # 104], at ECF page 10; Exhibit E to Defendants' Motion [Doc. # 107], at ECF page 8. As support for this assertion, Defendants unconvincingly cite to portions of Ray Baldwin's and Sam Baldwin's depositions. The deposition testimony cited, however, contains no date or even a time period when Bogan resigned.

CODE §§ 1331.61-1331.69; *Office Depot, Inc. v. Impact Office Products, LLC*, 821 F. Supp. 2d 912, 918 (N.D. Ohio 2011).  In Texas, misappropriation of trade secrets is a common law tort claim.  *See Trilogy Software, Inc. v. Callidus Software,* Inc., 143 S.W.3d 452, 464 (Tex. App.–Austin 2004, pet. denied); *see also Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 610 n.2 (5th Cir. 2011); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 458 (Tex. 1996) (both noting that Texas has not adopted the Uniform Trade Secrets Act).

Plaintiff only brings this cause of action as an Ohio statutory claim under OUTSA, and has not alleged a Texas tort claim in its Amended Complaint, the operative pleading for Plaintiff at this time.  Plaintiff, in its Amended Complaint, filed after the case was transferred to Texas and after Plaintiff was on notice that Texas law may apply, specifically alleges that Defendants' conduct constitutes a violation of OUTSA.  Amended Complaint, ¶ 33.[46]  The language in Plaintiff's allegations tracks the language of that statute.[47]  In contrast, Plaintiff did not include in its claim for misappropriation of trade secrets reference to Texas law or track language in Texas

---

[46] Plaintiff was aware at the time it amended its Complaint that Texas law might apply to this case.  Indeed, Plaintiff specifically amended the Complaint to bring a cause of action for attorneys fees under § 38.001 of the Texas Civil Practices and Remedies Code.  *Id.*, ¶¶ 80-81.

[47] For instance, the definition of "trade secret" under OUTSA includes information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  OHIO REV. CODE § 1336.1(D)(1), (2); *see also Al Minor & Assoc., Inc.*, 881 N.E.2d at 853.  Plaintiff alleges "McGowan's client lists and client-specific pricing and product information have independent economic value from not being known and from not being readily ascertainable by proper means and are the subject of reasonable efforts on behalf of McGowan to maintain their secrecy.  As such, this information constitutes trade secrets."  Amended Complaint, ¶ 31.

cases on this type of claim.  Plaintiff's cause of action for misappropriation of trade secrets is dismissed for failing to state a claim under Texas law.[48]

### D.  <u>Unjust Enrichment</u>

Plaintiff sues Bogan for unjust enrichment.  Texas courts recognize that "[a] plaintiff may recover under an unjust enrichment theory 'when one person has obtained a benefit from another by fraud, duress, or the taking of an undue

---

[48]  Plaintiff's claim for attorneys' fees pursuant to OUTSA § 1333.64(C), *see* Response, at 33, is also denied.  The Court does not reach the parties' arguments regarding whether Plaintiff's claims are preempted by OUTSA § 1333.67, which displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."  *See* OHIO REV. CODE ANN. § 1333.67(A); *Office Depot, Inc.*, 821 F. Supp. 2d at 918.  However, the Court notes that if Ohio law were to apply to Plaintiff's tort claims, it does not appear that OUTSA preemption would bar Plaintiff's tort claims *to the extent* they "possess[] an independent factual basis separate from the factual allegations establishing an OUTSA claim," and thus "the portion of the claim[s] supported by an independent factual basis [would] survive[] preemption."  *Kehoe Component Sales Inc.*, 933 F. Supp. 2d at 1015 (quoting *Int'l Paper Co. v. Goldschmidt*, 872 F. Supp. 2d 624, 635 (S.D. Ohio 2012)); *see also Office Depot, Inc.*, 821 F. Supp. 2d at 920-21; *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 724 (N.D. Ohio 2009).  For Plaintiff's claims for tortious interference with existing and prospective business relationships, Plaintiff has not identified any independent facts giving rise to these claims separate from the facts underlying its Ohio statutory misappropriation of trade secrets claim.  The renewals, quotes, and rate information Bogan allegedly diverted to SBI or UMI, which form the basis of Plaintiff's allegations for tortious interference with existing or prospective business relationships, are part of the same set of operative facts giving rise to Plaintiff's claim for misappropriation of trade secrets.  *Compare* Plaintiff's Motion, at 28; Amended Complaint, ¶¶ 54, 64, 57, 70 (discussing allegations regarding tortious interference claims), *with* Plaintiff's Motion, at 17; Plaintiff's Response, at 29 (discussing allegations regarding misappropriation of trade secrets claim).  However, the Court notes that, were Ohio law to apply to Plaintiff's tort claims, Plaintiff's claims against Bogan for unjust enrichment and breach of the duty of loyalty may well survive OUTSA preemption to the limited extent the claims were based on conduct that did not involve McGowan's confidential information, such as Bogan's alleged use of McGowan time and resources to recruit an assistant for his new employment.

advantage.'"  *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)); *accord Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 62 (Tex. 2008).

However, "[i]n Texas, unjust enrichment is based on quasi-contract and is unavailable when a valid, express contract governing the subject matter of the dispute exists."  *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001); *see also Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 196 n.32 (5th Cir. 2010); *Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 919, 929 (N.D. Tex. 2014).  This principle dooms Plaintiff's unjust enrichment claim in this case.

Plaintiff alleges Bogan "wrongfully retained amounts in the form of compensation from McGowan for the last two weeks of his employment with McGowan."  Amended Complaint, ¶ 78.  Plaintiff's arguments rely on the same alleged misconduct that give rise to Plaintiff's claims for Bogan's breach of the Agreement.  Plaintiff's briefing primarily cites Ohio law.  Plaintiff does not clarify its legal theory for an unjust enrichment claim under Texas law.  Since the Court concludes above that a valid, express contract exists governing the subject matter of Plaintiff's dispute, Plaintiff's claim for unjust enrichment is not viable under Texas law.

### E.   Breach of the Duty of Loyalty (Breach of Fiduciary Duty)

Plaintiff sues Bogan for breach of the duty of loyalty under Ohio law. Amended Complaint, ¶¶ 46-52.  Plaintiff alleges that Bogan breached his duty "not to use or disclose McGowan's confidential, proprietary, or trade information except in furtherance of McGowan's business."  *Id.*, ¶ 47.  Plaintiff further alleges that Bogan "breached his fiduciary duty of loyalty to McGowan by competing with McGowan

while employed by McGowan." *Id.*, ¶ 49.

As noted, Texas law governs this tort claim. Although Texas case law does not consistently refer to an employee's "duty of loyalty" *per se*, Texas law recognizes that an employee owes an employer fiduciary duties, which include a duty comparable to what Plaintiff alleges as a "duty of loyalty" under Ohio law.[49] Plaintiff does not cite in the Amended Complaint to Ohio statutes, and thus the Court construes Plaintiff's claim for breach of the duty of loyalty to include a claim for breach of fiduciary duty under Texas law.

In Texas, "[t]o succeed on a claim of breach of fiduciary duty, the plaintiff must show that a fiduciary relationship existed between the plaintiff and defendant, that the defendant breached his fiduciary duty, and that the defendant's breach caused injury to the plaintiff or a benefit to the defendant." *Meaux Surface Prot., Inc. v. Fogelman*, 607 F.3d 161, 169 (5th Cir. 2010) (citing *Navigant Consulting*, 508 F.3d at 283).

For the first element, the existence of a fiduciary duty, Texas courts have held that "the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." *Abetter Trucking*, 113 S.W.3d at 510; *accord Navigant Consulting*, 508 F.3d at 283; *Ray Mart Inc. v. Stock Bldg. Supply of Tex. LP*,

---

[49]     Texas law recognizes formal fiduciary relationships, which arise[] "as a matter of law and include[] the relationships between attorney and client, principal and agent, partners, and joint venturers," *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.–Houston [1st Dist.] 2003, no pet.)), and informal fiduciary relationships, which arise "where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one," *id.* (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006, pet. denied)). Texas courts have found that the employer-employee relationship gives rise to both formal and informal fiduciary relationships. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002); *Navigant Consulting*, 508 F.3d at 283.

302 F. App'x 232, 239 (5th Cir. 2008).  However, Texas courts "'have been and should be careful in defining the scope of the fiduciary obligations an employee owes when acting as the employer's agent in the pursuit of business opportunities.'" *Navigant Consulting*, 508 F.3d at 284 (quoting *Johnson*, 73 S.W.3d at 301).  The Texas Supreme Court balances an employer's right to receive loyalty with society's legitimate interest in encouraging competition.  *Id.* (citing *Johnson*, 73 S.W.3d at 301).  "Even the existence of a fiduciary relationship between employee and employer 'does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties.'"  *Id.* (quoting *Abetter Trucking*, 113 S.W.3d at 510).  "[U]nder Texas law, an at-will employee 'may properly plan to go into competition with his employer and may take active steps to do so while still employed.'"  *Id.* (quoting *Johnson*, 73 S.Wd.3d at 201).  Nonetheless, "the right to prepare to compete with one's employer is not absolute . . . ."  *Id.* (citing *Johnson*, 73 S.W.3d at 202).  "The employee may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists."  *Abetter Trucking*, 113 S.W. 3d at 512 (citing *Johnson*, 73 S.W.3d at 202; *Johnston v. Am. Speedtraining Acad., Inc.*, 526 S.W.2d 163, 166 (Tex. App.–Dallas 1975, no writ.); *Herrider Harms–El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476-77 (Tex. App.–El Paso 1975, writ ref'd n.r.e.)); *see also Navigant Consulting*, 509 F.3d at 284.

Plaintiff alleges that Bogan breached his fiduciary duties to McGowan by using McGowan's confidential information, misappropriating trade secrets, "using McGowan property to recruit employees for [SBI]," "soliciting McGowan's clients

to cease doing business with McGowan and begin working with [SBI]," and "forwarding quote requests from potential clients of McGowan to [SBI]."  Amended Complaint, ¶¶ 48, 49.   As discussed earlier, there are genuine disputes of fact regarding whether any of Bogan's conduct involved trade secrets or confidential information, whether Bogan wrongfully solicited clients, and whether Bogan directed viable business away from McGowan.

Additionally, the parties' arguments about damages generally do not distinguish between Plaintiff's claims for breach of contract and breach of fiduciary duty.  *See, e.g.*, Plaintiff's Response, at 23 (asserting "Plaintiff has been damaged by Defendants' wrongful conduct"); Defendants' Reply, at 13 (responding the Plaintiff's arguments under the general heading of "McGowan Has Not Shown it was Damaged by Bogan's Conduct").   Texas law allows for recovery of lost profit damages in breach of fiduciary duty causes of action.  *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010).  Similar to Ohio, Texas, requires that the injured party prove the amount of loss with reasonable certainty.  *Id.* at 877; *accord Holt Atherton Induc., Inc. Heine*, 835 S.W.2d 80, 94 (Tex. 1992).  For the reasons discussed above with regard to Plaintiff's breach of contract claim, the Court denies summary judgment for Plaintiff and Bogan on the damages element of Plaintiff's claim for breach of fiduciary claim.   On the record presented, neither party is entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty.

Plaintiff must identify in the more definite statement specifically what measure of damages it seeks on its breach of fiduciary duty claim, and must cite to evidence timely produced during discovery and to legal authorities on which Plaintiff relies.

## F.   Tortious Interference Claims

Plaintiff sues all Defendants for "tortious interference with business

relationships" and "tortious interference with prospective business relationships."
Amended Complaint, ¶¶ 53-73.   Plaintiff briefs these two "tortious interference"
causes of action as a single claim.   *See* Plaintiff's Motion, at 28 (which includes only
a single heading for tortious interference with prospective business relationships);
Plaintiff's Response, at 31 (only listing the elements for a claim for "tortious
interference of business relationships" under Ohio law); Plaintiff's Reply, at 14
("Bogan has failed to Rebut McGowan's Tortious Interference Claim").   Tortious
interference with "existing business relationships" and tortious interference with
"prospective business relationships" are two distinct causes of action under Texas law.
*See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 634 (5th Cir. 2002).[50]

In order to prevail on its claim against all Defendants for tortious interference
with an existing business relationship, Plaintiff must prove for each Defendant that
there were "(1) unlawful actions undertaken without justification or excuse; (2) with

---

[50]    Defendants' Motion suggests that Plaintiff brought a claim for tortious interference
with an "existing contract."   *See* Defendants' Motion, at 28.   Some Texas courts have
treated tortious interference with a "contract" and tortious interference with "business
relationships" as separate causes of action with slightly different elements. *See, e.g.*,
*Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345,
361 (Tex. App.–Houston [1st Dist.] 2013, pet. denied); *Lee & Lee Int'l, Inc.*, 261 F.
Supp. 2d 665, 678-79 (N.D. Tex. 2003).   Based on a plain reading of the Amended
Complaint, Plaintiff has alleged causes of action for tortious interference with
"business relationships" and tortious interference with "prospective business
relationships," *see* Amended Complaint, ¶¶ 53-73, and not tortious interference with
an "existing contract."   While Plaintiff's tortious interference allegations contain
general references to "business relations" and "contracts," *see, e.g.*, Amended
Complaint, ¶ 56, Plaintiff's briefing discusses only Defendants' alleged interference
with "business relationships" and contends that Bogan interfered with prospective
"business relationships" by redirecting requests for quotes or renewal rates. *See*
Plaintiff's Motion, at 28-29; Plaintiff's Response, at 31; Plaintiff's Reply, at 14-15.
There is no claim for tortious interference with an existing (or prospective) contract
in this case.

intent to harm; (3) actual damages; and (4) the actions were motivated by malice." *Apani Sw., Inc.*, 300 F.3d at 633-34; *Adrain v. Genetec Inc.*, Civ. Action No. 2:08-CV-423, 2009 WL 3161386, at *3 (E.D. Tex. Sept. 30, 2009) (Ward, J.); *see also Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 335 (Tex. App.–Houston [14th Dist.] 1991, no writ); *CF & I Steel Corp. v. Pete Sublett & Co.*, 623 S.W.2d 709, 715 (Tex. App.–Houston [1st Dist.] 1981, writ ref'd n.r.e.).  To prevail on a claim for tortious interference with prospective business relations, the Texas Supreme Court recently held that "the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result."  *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

The first element of Plaintiff's claim for tortious interference with an existing business relationship, unlawful action, is similar to the third element of Plaintiff's claim for tortious interference with a prospective business relationship, independently tortious or unlawful conduct.  For both claims, Plaintiff must "prove that the defendant's conduct would be actionable under a recognized tort."  *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).  "Conduct that is merely 'sharp  or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . ."  *Id.*

Summary judgment is denied without prejudice on Plaintiff's tortious interference claims.  The parties did not meaningfully address the elements under

Texas law for each of these two torts.[51]  Defendants also assert that Baldwin, SBI, and UMI are not "proper defendants" because Defendants assume Plaintiff is pursuing an agency liability theory on its claims against these parties.  *See* Defendants' Motion, at 32.[52]  Plaintiff, however, does not expressly allege in the Amended Complaint or meaningfully argue in its briefing facts or reasoning supporting an agency theory of liability as to any particular Defendant.  The Court concludes clarification is necessary on Plaintiff's tortious interference claims before legal analysis may proceed.

Plaintiff is required to file a more definite statement articulating its specific tortious interference theories under Texas law against each Defendant, respectively. Plaintiff must support each theory it intends to pursue with citations to evidence already in the record and legal authorities.

## IV.    **DEFENDANTS' COUNTERCLAIM**

Defendants assert a counterclaim under Rule 11 of the Federal Rules of Civil Procedure for "recovery of their respective reasonable and necessary attorney's fees which they have been caused to incur as a result of the groundless and bad faith

---

[51]    With regard to the damages element, the issues discussed earlier related to Plaintiff's damages arguments for breach of contract and breach of fiduciary duty apply to Plaintiff's tortious interference claims as well.  Under Texas law, Plaintiff may recover lost profit damages for tortious interference with existing and prospective business relationships.  *See Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 637-38 (Tex. App.–Fort Worth 2007, pet. denied); *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 633-34 (Tex. App.–Houston [1st Dist.] 2010, pet. denied).  But, the Court requires clarification as to whether Plaintiff seeks to recover damages under a theory of lost profits, and, if so, Plaintiff must direct the Court to admissible evidence Plaintiff disclosed during discovery in support of this damages theory.

[52]    The Court notes that Defendants did not provide any specific arguments or evidence related to UMI, even though, as the summary judgment movant, Defendants bear the initial burden to identify an "absence of a genuine issue of material fact" with regard to each of Plaintiff's claims against UMI.  *See ACE Am. Ins. Co.*, 699 F.3d at 839.

litigation which has been prosecuted against them by Plaintiff McGowan in this matter." Defendants' First Amended Answer and Counterclaim ("Amended Answer") [Doc. # 53], at 13, ¶ 12.  The Fifth Circuit has held that Rule 11 does not confer any substantive rights nor does it provide the basis for an independent cause of action. *Elliott v. M/V Lois B.*, 980 F.2d 1001, 1007 (5th Cir. 1993); *Port Drum Co. v. Umphre*, 852 F.2d 148, 150-51 (5th Cir. 1988).  "[T]he purpose of Rule 11 is to deter groundless proceedings, and not necessarily to compensate wronged parties." *Elliott*, 980 F.2d at 1007.  Defendants do not provide any arguments as to why they should be allowed to assert an independent cause of action under Rule 11.  It appears that Defendants have abandoned this argument.  Thus, to the extent Defendants seek to assert an independent cause of action under Rule 11, their counterclaim is dismissed.

To the extent Defendants, through their counterclaim, seek Rule 11 sanctions on the ground that Plaintiff's claims are frivolous, this argument clearly fails.  There has been extensive and necessary summary judgment briefing on a variety of legal issues.  The Court has concluded that there are several triable issues of fact for a jury.  This action is not groundless or frivolous, and Rule 11 sanctions are unwarranted.

Defendants attempt to salvage their counterclaim by arguing that it is actually a tort claim for tortious interference.  Response, at 25.  Without citing any evidence in the record, Defendants assert they "have alleged that McGowan's harassing and threatening email, among others, sent by its President and CEO, a licensed Ohio attorney, to Bogan tortiously interfered with Bogan's then current employment relationship with UMI."  *Id.*  The record, however, contains no prior evidence of Defendants asserting a tortious interference claim.  Defendants did make factual allegations about McGowan's president in their amended answer, but, the counterclaim contains no mention of tortious interference and does not purport to

bring a tortious interference claim in any way.  *See* Amended Answer, at 13, ¶ 15. Defendants may not expand their counterclaim by asserting a new theory of recovery in response to a motion for summary judgment.  *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).  Accordingly, Defendants have failed to raise a genuine dispute of material fact with regard to their counterclaim, and Plaintiff is entitled to summary judgment dismissing Defendants' counterclaim.

## V.    <u>CONCLUSION AND ORDER</u>

For the reasons explained herein, Ohio law applies to Plaintiff's breach of contract claim against Bogan.  Under Ohio law, the Agreement is not unconscionable and is generally enforceable as written or as amended, if necessary, once the jury determines at trial what information, if any, was misused by Bogan.  If Plaintiff prevails on its breach of contract claim against Bogan, Plaintiff may recover fair, just, and reasonable attorneys' fees under Paragraph 27 of the Agreement.  However, Plaintiff's claim for attorneys' fees under Texas Civil Practices and Remedies Code § 38.001 is dismissed as moot.

Summary judgment is denied for both Plaintiff and Bogan on Plaintiff's breach of contract claim.  There are genuine disputes of material fact on the issue of breach. Plaintiff is required to file a more definite statement clarifying its damages theories and directing the Court to evidentiary support disclosed during discovery, as well as legal authorities supporting each of Plaintiff's theories.

Texas law governs Plaintiff's tort claims.    Accordingly, Plaintiff's misappropriation of trade secrets claim is dismissed because Plaintiff has only alleged this claim as an Ohio statutory cause of action, and not a Texas common law tort.

Plaintiff's unjust enrichment claim is also dismissed because Texas law does not allow recovery under a theory of unjust enrichment when there is a valid, enforceable contract governing the subject matter of the dispute.  Plaintiff's breach of the duty of loyalty claim against Bogan is construed as a claim for breach of fiduciary duty. Summary judgment is denied for both parties on this claim due to numerous genuine disputes of fact on the element of breach and an insufficient record for the Court to reach the element of damages.

The Court denies without prejudice all parties' summary judgment motions on Plaintiff's claims for tortious interference with an existing business relationship and tortious interference with a prospective business relationship.  The parties have not meaningfully briefed their arguments on these claims under Texas law.  Plaintiff has not articulated anywhere these claims with sufficient precision and is ordered to provide a more definite statement clarifying each legal theory on which it intends to pursue a tortious interference claim against each Defendant, Bogan, Baldwin, SBI, and UMI, respectively.

Finally, Plaintiff is entitled to summary judgment on Defendants' counterclaim. Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Doc. # 111] is **granted in part** and **denied in part**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 96] is **granted in part** and **denied in part**.  It is accordingly

**ORDERED** that Defendants' counterclaim, *see* Defendants' First Amended Answer and Counterclaim [Doc. # 53], at 13-14, ¶¶ 12-15, is **DISMISSED with prejudice**.  It is further

**ORDERED** that Plaintiff's claims for misappropriation of trade secrets and

unjust enrichment are **DISMISSED with prejudice**.  It is further

      **ORDERED** that Plaintiff's claim for Attorneys' Fees Pursuant to Texas Civil Practices and Remedies Code § 38.001 is **DISMISSED as moot**.  It is further

      **ORDERED** that Plaintiff must file a more definite statement by **March 27, 2015** clarifying its tortious interference claims and damages theories.  In the more definite statement, Plaintiff must articulate under Texas law the specific tortious interference theories against each Defendant separately, and must support each theory by specific factual allegations and cite to supporting evidence timely produced during discovery.  Furthermore, Plaintiff's more definite statement must clarify under what theories it seeks damages, citing to evidence timely produced during discovery and citing to (a) Ohio law for its breach of contract claim and (b) Texas law for its claims of breach of fiduciary duty and tortious interference with existing and prospective business relationships.  Failure to timely file this more definite statement on any claim or theory will be taken as a representation that Plaintiff abandons the claim for damages and/or that aspect of its claims.  It is further

      **ORDERED** that, on the theories for damages and the tortious interference claims included in Plaintiff's more definite statement, any party may file a motion for summary judgment by **April 10, 2015**.  If a new motion for summary judgment is filed on Plaintiff's tortious interference claims or damages theories, the response from the opposing party shall be due **April 20, 2015**.  Any reply shall be due **April 27, 2015**.  It is further

      **ORDERED** that the parties are **required to mediate** this case again on or before **May 20, 2015**.  Finally, it is

      **ORDERED** that **docket call** in this case is **rescheduled** for **June 1, 2015 at 2:00 p.m.**  The parties' **joint pretrial order** is due **May 27, 2015**.

SIGNED at Houston, Texas this 17th of **March, 2015.**

_____

Nancy F. Atlas
United States District Judge